IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 14, 2006

## STATE OF TENNESSEE v. MICHAEL WHITE

**Appeal from the Circuit Court for Marshall County**
**No. 16303      Franklin Lee Russell, Judge**

_____

**No. M2005-01659-CCA-R3-CD - Filed July 13, 2006**

_____

The Defendant, Michael White, was convicted of five counts of rape and sentenced to fifty-five years in the Department of Correction.  The Defendant now appeals asserting that: (1) insufficient evidence was presented to support his convictions; and (2) the sentence imposed was excessive and contrary to law.  We affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Curtis H. Gann, Shelbyville, Tennessee (on appeal) and Andrew Jackson Dearing III, Shelbyville, Tennessee (at trial) for the appellant, Michael White.

Paul G. Summers, Attorney General and Reporter; Leslie Price, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Bernard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

At trial, the victim in this case, A.B.,[1] testified as follows: She is the Defendant's step-daughter and was thirteen and subsequently fourteen years old when the incidents at issue occurred. At the time of her testimony, she was in the ninth grade, however, her age was appropriate for the tenth grade.  A.B. testified that she was held back in kindergarten and that she has been in resource classes since the third grade because she has difficulty with reading, writing, and spelling.

_____

[1]We will refer to the Defendant's step-daughter by her initials, "A.B.," or as "the victim."  It is the policy of this Court not to identify her by her name because she was a minor when these events a occurred.

A.B. testified that, in 1999, her aunt, Diedre Potts, had a boyfriend named "Charlie" and that Charlie had "touched" A.B. and her younger sister. A.B. stated that, although Charlie touched her, no penetration took place. A.B. testified that, prior to the events involving the Defendant, she had never had sex, been penetrated, or injured in her vaginal area, and while she had started menstruating prior to the incidents with the Defendant she had never used a tampon.

A.B. stated that the first time the Defendant touched her inappropriately was a couple of days after A.B., her mother, and her sister had moved into the Defendant's apartment located on Bates Street in Marshall County, Tennessee. A.B.'s family moved in with the Defendant about one week after A.B. first met the Defendant, and after her mother had dated the Defendant for about a week. A.B. testified that she was asleep in the bedroom that she shared with her sister, and her mother was asleep in the bedroom that her mother shared with the Defendant. The Defendant entered A.B.'s room at around 1:00 or 2:00 a.m., woke A.B. up, and told A.B., "[G]et up; you can watch T.V." A.B. was happy to hear that she could get up because she enjoys watching television. A.B., who was wearing a Winnie the Pooh T-shirt and panties, got up and went into the livingroom. She sat down on the far right end of a couch that had space for three individuals, and she watched a cable television sitcom called "Smart Guy."

A.B. testified that, while she watched Smart Guy, the Defendant partially closed the door to A.B.'s bedroom and also partially closed the door to A.B.'s mother's bedroom. A.B. stated that between the livingroom and the bedrooms there is a hallway, and a curtain at the end of the hallway adjoins the livingroom. A.B. testified that the Defendant tied the curtain into a knot when he entered the livingroom. A.B. stated that the doors were left ajar and the curtain was knotted so that the Defendant could see anyone coming from the bedrooms down the hallway.

The Defendant sat down on the left side of the couch so that the cushion in the middle of the couch was between A.B. and him. A.B. said that the Defendant was wearing a pair of boxer shorts, but nothing else, and that he then moved next to A.B. and began rubbing her legs from the knees up. While the Defendant rubbed her legs, A.B. noticed that the Defendant had long fingernails. A.B. testified that the Defendant then pulled her panties down, taking them completely off of her left leg and down to her ankle on her right leg. A.B. recalled that she was scared and said that she told the Defendant to stop. She testified that she did not tell the Defendant to stop very loudly, however, she said it loud enough for the Defendant to hear her. A.B. stated that the Defendant stuck one of his fingers into her vagina and that it hurt. The Defendant's finger penetrated A.B.'s vagina, and he moved it around while it was inside of her. A.B. testified that, after the Defendant removed his finger from her vagina, the Defendant inserted his penis "all the way" into her vagina. She stated that she again told the Defendant to stop, but the Defendant said "no" and covered her mouth with his hands. A.B. indicated that the Defendant did not ejaculate on this occasion.

A.B. said that, after this incident the Defendant told her, "If you tell, nobody will believe you and it will split the family up." Additionally, the Defendant told A.B. to go into the bathroom and to douche. A.B. testified that her mother had previously shown her how to use a douche but that she had never used one before. A.B. said that, after she went into the bathroom, the Defendant followed

her and helped her with the douche. A.B. indicated that she was scared while this was happening, and she did not tell her mother about this incident because she was scared of the Defendant.

One week later, the Defendant approached A.B. when she was in the kitchen early in the morning doing her chores while her mother and sister were still asleep. When the Defendant entered the kitchen, A.B. was siting on the kitchen table wearing her Winnie the Pooh T-shirt, shorts, and panties. The Defendant touched A.B.'s leg, and she told him that if he did not stop she would scream. In response the Defendant put his hand over A.B.'s mouth. Although A.B. attempted to scream, she was unable to make enough sound for her mother or sister to hear her. A.B. stated that the Defendant used his free hand to pull down her shorts and that she attempted to keep them on with one hand while using her other hand to hold onto the table. She said that she held onto the table so that the Defendant could not slide her onto the floor. A.B. testified that she was unsuccessful in keeping her shorts and panties on and that the Defendant pulled them down to her ankles. She stated that the Defendant's fingernails were still long and that he stuck a finger inside her vagina, causing her pain. A.B. said that the Defendant scooted her to the edge of the table while he stood in front of her, and then he stuck his penis all the way inside her, which hurt. A.B. testified that, prior to this encounter, she did not know that men ejaculated, but when the Defendant removed his penis from her vagina "white stuff" came out of his penis. Afterward, A.B. cleaned herself with toilet paper. She stated that after each encounter with the Defendant she bled, but she was not menstruating.

A.B. testified that in August of 2003, after the Defendant and A.B.'s mother had married, she and her family moved with the Defendant into a three bedroom house on Lunn Street, which is also in Marshall County. The Defendant and A.B.'s mother shared a bedroom, while A.B. and her sister each had a room of their own. A.B. stated that, about one month after moving into the Lunn Street house, A.B. was watching a cartoon called "Kim Possible" before anyone else had awakened. A.B. was lying down on the right side of the couch, wearing a T-shirt, shorts, and panties, with her feet on the center cushion. She testified that the Defendant entered the room, sat down on the left side of the couch, and "yanked" her shorts and panties down to her ankles. The Defendant then inserted a finger into A.B.'s vagina and "move[d]" it around, which caused A.B. pain. She told the Defendant to stop, but she could not recall how he responded or if he responded at all. A.B. stated that the Defendant penetrated her with his penis, but he did not put his penis "all the way in," so it did not hurt her as much as it had previously.

Afterward, the Defendant told A.B. not to tell anyone. A.B. said that she did not tell anyone because she was scared of the Defendant. She also stated that she did not know if her mother would have protected her if she had told her, and when her mother ultimately found out she did not protect her. A.B. testified that she did not see her mother for a couple of weeks after her mother was notified of the allegations.

A.B. testified that, in December of 2003 or January of 2004 the Defendant's workplace was closed for the Christmas holidays, and another incident occurred during this time period. A.B. stated that she was asleep in her bed, wearing a T-shirt, panties, and shorts. She awoke to find the Defendant in her bedroom rubbing her legs. He then pulled her shorts and panties down to her knees

and inserted his penis into her vagina. A.B. told the Defendant to stop, which he did, but then told A.B. not to tell anyone.

A.B. testified that, on Easter Sunday in 2004, she awoke before anyone else in the home, and she attempted to change the batteries on a karaoke machine in the livingroom. She was dressed in a T-shirt, shorts, and panties. She did not have any batteries, so she went into the bedroom that her mother and the Defendant shared to request batteries for the karaoke machine. The Defendant gave A.B. new batteries, and she returned to the livingroom and began singing into the machine. A.B. had recently broken her right ankle, which was in a "boot," and she was sitting on the arm of a love seat while singing. After approximately five minutes, the Defendant emerged and began singing into the karaoke machine too. Shortly thereafter, the Defendant left, and A.B. turned off the karaoke machine and began watching televison. A.B. stated that, at this time, the Defendant reappeared and began rubbing her legs. The Defendant then pulled A.B.'s shorts and panties off of her left leg and down to the boot on her right ankle. A.B. testified that the Defendant stuck his finger into her vagina and subsequently stuck his penis "all the way" in as well. She stated that when the Defendant put his penis inside of her, it hurt her. The Defendant told her to be quiet and not to tell anybody what had happened. A.B. also testified that, while living on Lunn Street, she had not had her period for a couple of months, and the Defendant gave her two pregnancy tests.

A.B. said that, she never told her mother about any of the five incidents because she was scared that her mother would not believe her and also because she was scared that the Defendant would hurt her. Eventually, A.B. told some of her friends at school about the abuse and then reported the abuse to school officials. A.B. admitted that the fact that the Defendant had recently "grounded" her was the impetus for revealing the abuse. The Defendant grounded her because he caught a boy, S.H., sneaking out of A.B.'s window one morning. A.B. said that she and her younger sister had let S.H. in through the window on a couple of occasions and that nothing improper had taken place between A.B. and S.H. A.B. testified that being grounded made her angry at the Defendant and that was why she reported the abuse.

Initially, A.B. shared the information with Carol Jean, a detective with the Lewisburg Police Department, and Jessica Miller from the Department of Human Services. Detective Jean and Miller took A.B. home and then to her grandmother's house.

On cross-examination, A.B. admitted that in 1999 she had not hesitated to report that her aunt's boyfriend, Charlie, had molested her and her sister. She also acknowledged that Charlie had not been prosecuted or arrested in connection with the alleged sexual assault. A.B. repeated that, each time that she told the Defendant to stop, she used a normal speaking voice and did not yell or scream. She also testified that she had argued with the Defendant about S.H. coming into the house on previous occasions. Finally, she acknowledged that about a month after her family moved into the Defendant's home on Bates Street she had told her mother that all of her friends had been molested or raped.

On re-direct examination, A.B. maintained that her friends had in fact been molested and raped. She also stated that she cried after each incident with the Defendant took place. A.B. said that another reason she reported the rapes to the authorities was encouragement from a friend at school who said that she had been raped in the past. A.B. reiterated that she never had sex with S.H. when he was in her house.

Wayne Wesson, a special agent with the Tennessee Bureau of Investigation ("TBI"), testified that, on April 21, 2004, the District Attorney General's Office requested that he assist the Lewisburg Police Department with an investigation of the Defendant. He stated that later that day, he traveled to Cosmolab, where A.B.'s mother, Stephanie White, worked to discuss the case with her. Miller and Detective Jean accompanied Agent Wesson. After speaking with White, it was agreed that A.B. would be removed from White's custody and would be placed in her grandmother's home for her protection.

Agent Wesson obtained permission from Stephanie White to search the family's home on Lunn Street, and the agent and Detective Jean proceeded to search the property. Agent Wesson entered the residence looking for physical evidence of the crimes or evidence of a predisposition for pedophilia. He requested a "Woods Light" from the hospital, which is a flourescent light used to detect latent fluids on carpeting, furniture and other objects. Agent Wesson used the Woods Light on the loveseat and found that there had been some kind of fluid spilled on the arm and on the cushions at some point. He also used the Woods Light on A.B.'s bed, but he did not detect any fluid on the bed. Agent Wesson stated that, if the sheets on the bed had been washed at some point after human fluid had been on them, the Woods Light would probably not be able to detect the spill. In order to determine if the fluid on the love seat was human fluid, and, subsequently, to determine what kind of human fluid, Agent Wesson had to take the stained material to the crime laboratory. To do so, he removed the fabric from the arm of the love seat with a knife, and he also took a pillow, a pillow cover, and two cushion covers. The TBI's serology tests were not available until June and did not reveal the presence of semen on any of the material tested.

On April 22, 2004, Agent Wesson interviewed the Defendant. The Defendant stated that he loved both of his step-daughters and was trying to make their lives better. The Defendant said that the girls often hugged him and kissed him on the cheek when he would do something nice for them. He also told the agent that he had never physically punished either girl, although he had used physical punishment as a threat on many occasions. The Defendant felt that A.B. may have made her allegations because "she had boys on her mind," and he said that she had been sneaking boys into the house. He also said that A.B. may have been jealous of his relationship with A.B.'s mother. The Defendant asserted that he had never had sex with either of his step-daughters and that he did not "look at them in a sexual way."

Agent Wesson said that, in order to better gather information, he used the tactic of accusing the Defendant of committing the crime. He told the Defendant that he believed that the Defendant had raped A.B. and that he believed A.B. was telling the truth. Agent Wesson said that he was "taken back" by how angry the Defendant became after being accused. At this point in the

investigation, the TBI serology report had not yet come back negative, and Agent Wesson told the Defendant that he had removed physical evidence from the Defendant's home that he felt would incriminate the Defendant when it came back from the crime lab. The Defendant became very agitated with Agent Wesson, which the agent felt was due to the fact that he had not asked the Defendant how the Defendant's semen may have ended up on the arm and cushions of the loveseat. Agent Wesson stated that the Defendant asserted that he had been watching an "[X]-rated movie" and that he had masturbated and wiped the semen on the arm and cushions of the loveseat. Agent Wesson then asked the Defendant if he was willing to consent to a DNA test. The Defendant agreed to submit a blood sample, stating that he wanted to cooperate because he was not guilty of the accusations.

Agent Wesson testified that the hospital was a couple of miles away from the courthouse, where his interview with the Defendant was conducted, and that it was a three or four minute drive. Agent Wesson and Detective Jean intended to have the Defendant follow them to the hospital, but they could not locate the Defendant in the courthouse parking lot. They then decided to drive to the hospital, assuming that the Defendant would be there as he had indicated that he would. However, the Defendant was not there, and after roughly ten minutes of waiting for the Defendant to show up, Agent Wesson and Detective Jean left to look for him. They did not locate the Defendant at his residence and did not see him on the freeway, so they drove back to the hospital but were still unable to locate him.

On the third day of the investigation, April 23, 2004, the victim was brought to Our Kids Clinic, in Nashville, for an examination. After receiving the results of the examination, on April 27, 2004, Agent Wesson obtained an arrest warrant for the Defendant. On May 7, 2004, the arrest warrant was served in Jackson, Tennessee.

On cross-examination, Agent Wesson said that the Defendant's statement at the courthouse on April 21, 2004, indicated that, when A.B. had asked the Defendant for batteries for the karaoke machine, the Defendant had asked White where the batteries were, which indicated that White was awake at the time. The agent also said that Stephanie White remembered hearing A.B. singing on the karaoke machine. Agent Wesson acknowledged that he told the Defendant that sometimes people who commit these types of crimes need help, hoping that this would induce a confession, but he denied ever promising the Defendant any kind of special treatment or deal in exchange for a confession. Agent Wesson testified that the Defendant did not confess despite his statement regarding pedophiles needing help.

Cynthia Bivens, who works in the attendance and payroll department at Cosmolab, testified that both the Defendant and Stephanie White left work early on April 21, which was the day that Agent Wesson interviewed White at work. She said that they worked for four hours and fifteen minutes of their shift. Bivens said that neither of them gave any notice that they would be away, and neither of them ever reported back for work. She also stated that neither of them came to pick up their last paycheck.

On cross-examination, Bivens acknowledged that at Cosmolab employees may take advances on vacation time and that the money that the employee owes the company for the advancement on vacation days is taken out of future paychecks. She said that the Defendant had taken several vacation days prior to actually accruing them. Bivens testified that the Defendant's final paycheck was for $97.68 and that it was not enough to cover the vacation time he owed Cosmolab. Bivens agreed that the Defendant owed Cosmolab his entire final paycheck and some additional undisclosed amount. She admitted that, had the Defendant come back to Cosmolab to pick up his final paycheck, Cosmolab would not have issued the check because of the money the Defendant owed. On re-direct examination, Bivens said that White also failed to pick up her final check, and White's final check was worth $156.60. On re-cross, Bivens acknowledged that White also owed Cosmolab some money for an advancement on vacation time.

Holly Galleon, a pediatric nurse practitioner at Our Kids Clinic, testified that she examined A.B. on the third day of the investigation, April 23, 2004. She said that A.B. reported digital and penile penetration of her vagina. Upon examining A.B.'s genitalia, Galleon observed a tear at the base of A.B.'s hymen, which indicated that there had been some type of penetrating injury to that part of A.B.'s body. Galleon stated that she had examined A.B. in 1999 at Our Kids Clinic, and that, at that time, A.B.'s hymen was fully intact.

Detective Carol Jean, with the Lewisburg Police Department, testified that she was contacted by a counselor at Lewisburg Middle School about A.B.'s allegations. Detective Jean then participated in the investigation of the allegations, beginning with an interview of A.B. and further activities consistent with the testimony of TBI agent Wesson. Detective Jean testified that after the Defendant failed to appear at the hospital following his statement to Agent Wesson, she eventually was able to locate the Defendant in Jackson, Tennessee, and she participated in his arrest and return to Lewisburg.

The Defendant testified that, at the time of trial, he was forty-three years old. He admitted that in September of 1998 and February of 2002 he had been convicted of passing a worthless check. The Defendant offered that his wife was a light sleeper and that he could not get out of bed without her waking her up. He stated that A.B. and her sister were not supposed to have friends over at the house while their mother and the Defendant were at work, however, he had caught them allowing two boys to sneak into the house one day as the Defendant was leaving the house. He said that the boys admitted that they had snuck into the house on numerous occasions. The Defendant testified that he grounded the girls for allowing these boys into the house, and he said that the girls did not like being punished. He described his relationship with A.B. and her sister as a normal relationship like "any father with their kids." He said he was shocked to hear A.B. testify that she was scared of him. He said that he always spoke with and played with the girls, but when they had done something wrong he punished them. He said he never "put a hand on them, never whipped them," but he had grounded them and taken their television privileges away.

The Defendant testified that he never wavered in asserting his innocence while being interrogated by Agent Wesson. He also said that Agent Wesson told him that the agent knew that

the Defendant had done what he was accused of and that if the Defendant confessed the Defendant would get a "second chance." The Defendant testified that Agent Wesson told him, "[a]ll I have to do is . . . talk to the D.A. and tell him whatever I want to tell him; he'll believe me." The Defendant stated that he told Agent Wesson that he wanted a lawyer and tried to leave but that Agent Wesson jumped out of his chair and said "you [can] go get . . . a lawyer once you give me your blood," referring to a DNA sample. The Defendant said that Agent Wesson "cornered" him, as if Agent Wesson thought the Defendant was going to try to run away. The Defendant felt that the only way for him get out of the interrogation was to tell Agent Wesson that he would agree to a blood test, so he did. The Defendant stated that he and White then drove to the hospital and waited there for four or five minutes, but they left because they did not trust Agent Wesson. The Defendant testified that, because Wesson had told the Defendant that the Defendant could not speak to an attorney until he aive Wesson a sample of his blood, he was afraid he was being "framed." The Defendant said that he did not want to submit to a blood sample until he had spoken with a lawyer so that he would know what was happening with his DNA test.

The Defendant said that, after leaving the hospital, he and his wife went to Cosmolab to pick up their paychecks, and everyone at Cosmolab knew about the allegations. Then they drove to Fayetteville, Tennessee, because the Defendant knew an attorney in Fayetteville named Raymond Fraley. The Defendant testified that he went to Fraley's office but that Fraley was in court in Lewisburg, so he left a message with Fraley's secretary about the nature of his legal needs. Shortly thereafter, Fraley contacted the Defendant and spoke with him about the case. Although Fraley said he would take the case if the Defendant were arrested, the Defendant could not afford Fraley's fee.

The Defendant testified that he and his wife went to Jackson, Tennessee, to try to sell what he could "off of" his 1992 Chevrolet Suburban to obtain money to pay attorney fees. In addition, the Defendant's sister lived in Jackson, and the Defendant believed that his sister might help him financially. The Defendant testified that he and White only planned to stay in Jackson for a couple of days, but they ended up staying and seeking work because they needed the money. Initially, they stayed with the Defendant's sister, then in a motel, but they decided it was more economical to rent an efficiency apartment and stay for a couple of weeks. The Defendant testified that he and White knew that White's mother had custody of A.B. and her sister, so they knew she would take care of the girls. He said he and his wife always planned on returning to Lewisburg after a couple of weeks of work. The Defendant stated that he called numerous family members and told them where he and White were staying. On May 7, he was arrested in the apartment they had rented in Jackson.

The Defendant testified that, upon being brought back to Lewisburg, he submitted to a voluntary DNA test. The Defendant said that, at the time that he gave the DNA sample, no one had informed him that the TBI tests on the loveseat fabric had come back negative for human fluids. He testified that nothing improper between A.B. and him ever took place.

On cross-examination, the Defendant agreed that the TBI tests were not available until June 9, 2004, and the Defendant gave his DNA sample on May 10th or 11th, thus, the State did not yet

know whether there was human fluid on the loveseat fabric when the Defendant submitted his DNA sample. He agreed that, in spite of the fact that Agent Wesson had not placed the Defendant under arrest, the agent had read the Defendant his rights and had the Defendant read and sign a waiver of rights form. The Defendant acknowledged that he understood the rights that Agent Wesson had articulated. The Defendant testified that, although the interrogation took place in the courthouse, a public building, Agent Wesson raised his voice when he accused the Defendant of being guilty of the accusations leveled against him. The Defendant denied raising his voice in response to Agent Wesson.

The Defendant reiterated that he told Agent Wesson that he wanted an attorney and said that Detective Jean and Miller were present in the room when he made his request. The Defendant also acknowledged that neither he nor White actually worked while they were in Jackson, and the Suburban did not have any for sale sign on it when the Defendant was arrested. The Defendant stated that there was no for sale sign on the Suburban because he took the sign off of the car at night. The Defendant denied telling Agent Wesson that he had watched pornographic movies, masturbated, and wiped his semen on the loveseat. The Defendant said that he was "shocked" to hear Agent Wesson's testimony regarding this occurrence.

Agent Wesson was recalled and stated that the Defendant had never requested an attorney and that the Defendant had never indicated that he wished to stop speaking with Agent Wesson. The agent repeated that he never raised his voice with the Defendant but that the Defendant raised his voice with Agent Wesson. The agent said that he was startled by how aggressive the Defendant became and that he felt that the Defendant might become physically aggressive. Agent Wesson also repeated that the Defendant had told him specifically that the Defendant had watched an "[X]-rated" movie on the loveseat, masturbated, and wiped his semen on the armrest.

Jessica Miller, who is employed with the Department of Children's Services, testified that she never heard Agent Wesson raise his voice. She stated that she was in the interrogation room for the first ten minutes of the interrogation, and she spent the remainder of the interrogation roughly two feet from the room with a frosted-glass door between her and the interrogation room. She said the Defendant was not screaming but that he was "hollering . . . . very, very loud[ly]."

## II. Analysis

On appeal, the Defendant asserts that: (1) insufficient evidence was presented to support his convictions; and (2) the sentence imposed was excessive and contrary to law.

## A. Sufficiency of the Evidence

The Defendant alleges that there is insufficient evidence in the record to support his rape convictions, stating that the only proof presented in this case was the testimony of the victim, A.B. The State counters that the evidence presented regarding each count was sufficient for a rational trier of fact to find the essential elements of rape beyond a reasonable doubt.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775. Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-13-503(a) (2003), in pertinent part, defines rape as:

unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent . . . .

Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (2003).

We begin our analysis by noting that it is well-settled law in Tennessee that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). In the case at issue, the evidence of rape consisted almost entirely of testimony by the victim, A.B. She described five separate incidents of sexual penetration that took place with the Defendant in sufficient detail, and, when looked at in the light most favorable to the prosecution, her testimony establishes the essential elements of the crime beyond a reasonable doubt. Specifically, A.B.'s testimony alleged that she suffered forcible digital and penile penetration by the Defendant during five separate encounters, all of which caused her great pain and distress. She stated that the

Defendant covered her mouth to keep her from yelling, told her that no one would believe her if she came forward about the rapes, and told her that doing so would break apart her family. Additionally, A.B. stated that she was forced to douche after the first incident, that she bled as a result of being raped, and that the Defendant ejaculated during at least one of the encounters. It should be observed that violent opposition to an unlawful sexual advance is not necessary to establish rape, thus, although the Defendant maintains that the victim should have said "no" louder, the relative intensity of the victim's protest is immaterial. See Tenn. Code Ann. § 39-13-503(a). The testimony of A.B. was arguably corroborated in part by the testimony of Ms. Galleon of Our Kids Clinic, who opined that A.B.'s hymen was intact in 1999 and had been torn by a penetrating injury upon being examined on April 23, 2004.

During the sentencing hearing, the trial court noted that A.B. "was a very persuasive witness. She was telling us the truth during [the] trial. I have absolutely no doubt about it." As stated above, questions of witness credibility and weight and value of evidence are to be determined by the trier of fact, and in this case A.B.'s testimony, as highlighted by the trial court, was credible. The Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant next asserts that his sentence is excessive and contrary to law. He specifically contends that the trial court erred when it imposed a sentence of eleven years on each count of rape and then ordered that the sentences run consecutively. The State maintains that the Defendant's fifty-five year sentence was proper.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). Because our review of the record in this case reveals that the trial court considered the sentencing principles and all relevant facts and circumstances, the aforementioned "presumption of correctness" is applicable.

In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the pre-sentence report; © the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or

treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Comm'n Cmts. So long as the sentencing court followed the appropriate statutory procedure and imposed a lawful sentence after giving due consideration and proper weight to the factors and principles under law, and so long as the sentencing court's findings of facts are adequately supported by the record, then this Court may not modify the sentence, even if actually preferring a different result. Goodwin, 143 S.W.3d at 783 (citing State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998)).

Tennessee Code Annotated section 40-35-103(1) (2003) states that:

Sentences involving confinement should be based on the following considerations:
(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Additionally, "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). The trial court may consider enhancement and mitigating factors when determining a defendant's sentence. See Tenn. Code Ann. §§ 40-35-113, -114 (2003).

### 1. Enhancement Factors

The Defendant contends that the trial court erred in applying and weighing the enhancement factors used to arrive at a sentence of eleven years for each conviction. The first factor applied by the trial court was enhancement factor number two, which allows the trial court to adjust a defendant's sentence if, "The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Tenn. Code Ann. § 40-35-114(2). The trial court stated:

We do have factor number 2 which is the previous history of criminal convictions. These are not[,] to say the least[,] the most serious convictions but there are some present. There are in 2001, 2000, and 1998 [a] total of six PWC convictions[,] and in 2000 we have an assault and then there was no driver['s] license in '95. I don't give the no driver['s] license any weight.

-12-

The trial court made an affirmative showing in the record that it considered the sentencing principles and appropriate facts and circumstances. We conclude that the trial court properly applied Tennessee Code Annotated section 40-35-114(2) when it enhanced the Defendant's sentence.

The Defendant also challenges the trial court's use of enhancement factor number five, which allows for a greater sentence if the "victim of the offense was particularly vulnerable because of age or physical or mental disability." Tenn. Code Ann. § 40-35-114(5). The Defendant asserts that the victim was not particularly vulnerable, while the State maintains that the victim's need for resource classes qualifies her as especially vulnerable.

A victim's youth does not necessarily equate with vulnerability. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993) *superseded, in part, by statute* 1995 Tenn. Pub. Acts Ch. 302 (S.B. 1758), *as recognized in* State v. Jackson, 60 S.W.3d 738, 741-42 (Tenn. 2001). The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence "need not be extensive." Poole 945 S.W.2d at 97. Also, a court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving "additional weight . . . to the age of the victim in those cases where a victim is extremely young or old." Id.;see State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001). The Legislature has determined that a sentence may be enhanced if "a victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ." Tenn. Code Ann. § 40-35-114(5). In Adams, the Tennessee Supreme Court provided a framework for application of this factor:

> [T]he vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age. . . . The factor can be used . . . if the circumstances show that the victim, because of his age or physical or mental condition was in fact "particularly vulnerable," i.e., incapable of resisting, summoning help, or testifying against the perpetrator.

Adams, 864 S.W.2d at 35. Although it is not difficult to imagine cases in which the victim's age, whether very young or very old, may seem to equate with vulnerability, the Adams Court chose not to presume such a conclusion in any case. Id. Moreover, because Tennessee Code Annotated section 40-35-114(5) does not speak to specific ages, but rather to vulnerability, our Supreme Court could not create a bright-line rule. Thus, the Court concluded that, "The State bears the burden of proving the victim's limitations rendering him or her particularly vulnerable." Adams, 864 S.W.2d at 35; see also State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

Whether a victim is "particularly vulnerable" for purposes of Tennessee Code Annotated section 40-35-114(5) is "a factual issue to be resolved by the trier of fact on a case by case basis." Poole, 945 S.W.2d at 96; Adams, 864 S.W.2d at 35.

In the case at issue, the trial court applied this factor stating:

> The factor . . . to which I give the greatest weight . . . is factor number 5. This was a vulnerable victim not only by reason of her age but also by reason of her intellectual limitations. She was in resource. You could tell from her testimony that she was perhaps not the sharpest knife in the drawer. But she certainly was a very persuasive witness. She was telling us the truth during that trial. I have absolutely no doubt about it. She was a vulnerable victim and he took advantage of her. That is not necessary to be the only offense, therefore I am giving it considerable weight.

A victim's age or physical condition might make the victim "vulnerable" in a general sense. That particular vulnerability, however, may play no part in the crime. A vulnerability that is wholly irrelevant to the crime is not "appropriate for the offense" as required by Tennessee Code Annotated section 40-35-114. See, e.g., Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994) (holding advanced age of victim irrelevant when "weight lifter, football player, or any other person, male or female, who possessed adequate strength to resist a crime against the person" would have been killed by a defendant's reflex gunshot from a distance); State v. Seals, 735 S.W.2d 849, 853-54 (Tenn. Crim. App. 1987) (holding advanced age of victims irrelevant when crime was theft from victims's mailboxes and criminals had no contact with victims themselves; crime would have been no different had victims been "robust athletes").

In the present case, we apply an analogous line of reasoning in determining whether the victim's intelligence or learning disabilities played a role in facilitating the crime. In State v. Clabo 905 S.W.2d 197, 206 (Tenn. Crim. App. 1995), this Court held that the fact that the victim suffered from a learning disability would allow the trial court to apply Tennessee Code Annotated section 40-35-114(5) to enhance the defendant's sentence. However, in our view, the mere fact that a youth suffers from a learning disability or is enrolled in resource classes does not make the victim especially vulnerable per se without a sufficient articulation in the record of the facts which support a finding that such a "vulnerability" is relevant to the crime. A learning disability or moderately below average level of cognitive reasoning does not necessarily fetter a child in the way the Tennessee Supreme Court described in Poole. Poole, 945 S.W.2d at 96. Again, in order to apply Tennessee Code Annotated section 40-35-114(5), the victim must be incapable of *resisting, summoning help, or testifying* against the perpetrator because of the victim's age or physical or mental condition. Adams, 864 S.W.2d at 35.

In the case at hand, the trial court stated that the victim was in resource classes and "was perhaps not the sharpest knife in the drawer" but went on to state that "she certainly was a very persuasive witness." A.B. was thirteen years old when the first two incidents took place and was fourteen years old when the final three incidents took place. As such, her age alone cannot be used to justify an enhanced sentence under Tennessee Code Annotated section 40-35-114(5). There is nothing in the record to indicate that the victim was in resource classes due to a physical disability that would keep her from resisting, summoning help, or testifying. Likewise there is nothing in the record to indicate that she was in resource classes due to an extremely low level of intelligence which could make it difficult for her to resist, summon help, or testify in court. To the contrary, A.B. was thoughtful and articulate with her responses, considering the traumatic nature of the incidents she

-14-

was being asked to recall. To find that she was particularly vulnerable due to her age and below average level of intelligence without finding facts in the record to support the assertion contravenes the legislature's intent as articulated in Adams. Therefore, in our view, the trial court erred in applying Tennessee Code Annotated section 40-35-114(5) as an enhancement factor in this case.

The Defendant also contends that the court erred when it applied enhancement factor number nine, that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Tenn. Code Ann. § 40-35-114(9). The Defendant says that this factor was improperly applied because the offenses he was on probation for were minor. The trial court articulated its reasons for applying factor number nine, stating:

> Factor number 9 I do find to be present and that is unwillingness to cooperate with the terms of release into the public. I direct your attention to the two probation violations that are at the bottom of [p]age 18 that have been discussed by Ms. Ladner. One is violation of probation on which he was placed by the Maury County General Sessions [C]ourt. The second is 2002 and 2001 he was placed on - - he violates the terms of his probation and which he had been placed by the Lawrence County General Sessions [C]ourt. There is a previous history of unwillingness to cooperate with terms of release into the public.

The Defendant contends that the trial court placed too much weight on this factor because the offenses for which he was on probation were minor offenses. However, our reading of Tennessee Code Annotated section 40-35-114(9) does not reveal any accounting for the nature of the offense behind a probation violation. The fact that probation may have been prescribed for less serious offenses is not at issue. The matter at hand is the Defendant's previous unwillingness to comply with the terms of a trial court's sentence. Accordingly, we find that the Defendant has not met his burden of proof in establishing that the trial court improperly applied this factor, and the Defendant is not entitled to relief on this issue.

The final factor that the Defendant asserts was improperly applied is that, "The defendant abused a position of public or private trust . . . ." Tenn. Code Ann. § 40-35-114(16). The Defendant asserts that because he was not the victim's father, the court improperly applied this factor. The trial court stated that:

> I find also that factor number 16 in the statute is present. He did abuse a private trust. He was the step-parent of this victim. Almost from the day he moved in, according to the evidence we heard at trial, he began to abuse that position. There were times when he was the only adult with the child. There were times when the mother was in the house and was asleep or was otherwise preoccupied. But certainly he was the adult responsible for the child at [the] time and he abused that private trust repeatedly.

On appeal, the Defendant argues that he was not the Defendant's father and that the victim's mother was responsible for her, thus, factor number sixteen does not apply. We disagree. Although it is true that the Defendant was not the victim's father, he was the victim's stepfather, and he was responsible for her care. As the trial court noted, the Defendant was often home alone with A.B., and at other points he was responsible for A.B.'s care when A.B.'s mother was unavailable. The Tennessee Supreme Court held that a defendant's status as "live-in boyfriend" was sufficient to find an abuse of private trust and thus the application of Tennessee Code Annotated section 40-35-114(16). Adams, 864 S.W.2d at 34. The Defendant does not cite to any contrary authority and is not entitled to relief on this issue.

Although the record does not provide a sufficient factual basis for applying enhancement factor number five, we agree with the trial court's imposition of an enhanced sentence based upon the other three factors applied and the finding by the trial court that no mitigating factors are applicable. Accordingly, we conclude that there were ample grounds for the court to enhance the Defendant's sentence, and we affirm the Defendant's sentence of eleven years on each count of rape.

## 2. Consecutive Sentencing

The Defendant asserts that the trial court erred when it ordered the Defendant's sentences to run consecutively. The State maintains that the trial court adequately articulated the facts that supported consecutive sentencing and that ordering the sentences to run consecutively was within the trial court's discretion. We agree with the State.

Consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115 (2003), which states in pertinent part:

> The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that: . . . . The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims . . . .

The trial court has discretion to order consecutive sentencing if it finds that one or more of the required statutory criteria exist. State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). However, in State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987), the Tennessee Supreme Court set out factors to be considered prior to imposition of a consecutive sentence and warned against imposing consecutive sentences where the length of the sentence was not related to the severity of the offense:

> Trial courts should weigh the aggravating circumstances arising from the relationship between defendant and the victim or victims, the age of the victim or

victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim or victims and determine the appropriate use of consecutive sentencing accordingly, bearing in mind the general objectives set forth in Gray. Obviously, no rigid formula for application to such cases would be appropriate, but we caution that consecutive sentences should not routinely be imposed in sexual abuse cases, or in other cases, and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved. See ABA Standards for Criminal Justice, Second Edition § 18-4.5.

In the case at issue, the trial court noted that Tennessee Code Annotated section 40-35-115(d) creates a presumption in favor of concurrent sentencing, but stated that this presumption can be overcome saying:

Factor numbers which would create exceptions to that presumption or would overcome that presumption I find certainly that factor 5 is present. There were more than two sexual abuses to this child that occurred. They happened over an extended period of time. This is not a situation in which all of these occurred on one day or a weekend[,] but rather this poor child endured this for a period of months. I do find that the presumption is overcome to this extent.

We agree with the trial court's finding that Tennessee Code Annotated section 40-35-115(b)(5) applies to the case under submission, and we note that upon imposing consecutive sentences, the trial court made the following finding:

Let me discuss a couple of reasons I don't think we have really talked much about the psycho-sexual evaluation but I do note that Dr. Lancaster found him to be a moderate to high risk for sexual recidivism. He found moderate psychopathy, if I am saying that correctly. The reason that I believe that he would continue to do this, and there is no potential for rehabilitation, he would re-offend if released into the public, is the fact he did this to this girl over an extended period of time. Not just one occasion. He didn't just get drunk on one occasion and do this to her. He did it in a very calculated way over a period of months. I am completely convinced that whatever day, if and when he gets out of the penitentiary, he will set about to do this again. I think he is a very strong risk to repeat.

In our view, the trial court found, based upon the foregoing, that the aggregate maximum of consecutive terms in this case was reasonably related to the severity of the offenses involved. We will not disturb that finding.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE